IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HEATHER LISENBY,<br>o/b/o G.G., a minor, | : Civil No. 1:24-CV-1656<br>:<br>: |
| Plaintiff, | :<br>:<br>: |
| v. | :<br>: |
| | : (Chief Magistrate Judge Bloom) |
| LELAND DUDEK, Acting<br>Commissioner of Social Security,[1] | :<br>:<br>: |
| Defendant. | :<br>: |

## MEMORANDUM OPINION

### I. Introduction

On June 23, 2021, Heather Lisenby filed an application for child disability benefits on behalf of her minor son, G.G., under the Social Security Act. Following a hearing before an Administrative Law Judge ("ALJ"), the ALJ found that G.G. was not disabled since June 23, 2021, the date of the application.

Lisenby now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record,

---

[1] Leland Dudek became the Acting Commissioner of the Social Security Administration on February 19, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Leland Dudek is substituted as the defendant in this suit.

and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we conclude that substantial evidence supports the ALJ's findings in this case.  Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.    <u>Statement of Facts and of the Case</u>

Lisenby filed an application for child disability benefits on behalf of her son, G.G., who was 16 years old on the date of the ALJ's decision.  (Tr. 11).  He alleged an onset date of September 7, 2010.  (Tr. 10).  G.G. alleged disability based on ADHD, oppositional defiance disorder ("ODD"), bipolar II disorder, depression, anxiety, and sleep disorder.  (Tr. 60).

The record indicates that G.G. had trouble getting along with others from a young age.  School records from Harding Elementary School in 2013 noted that G.G. hit another student on the bus, and that he had previously been warned to keep his hands to himself.  (Tr. 222).  Other entries on this discipline log indicate that in April of 2014, G.G. stole money from another student and lied about stealing the money.  (*Id.*).

Around this time, treatment records from Good Samaritan Hospital indicate that G.G. was on a strict regimen for his ADHD, and that he was hyperactive and unable to sleep. (Tr. 391). Harding Elementary noted another incident in November of 2014, when G.G. hit another student at recess. (Tr. 222). In November of 2015, G.G. was admitted to Philhaven's Lebanon Child Day Hospital Program "due to emotional difficulties." (Tr. 192).

G.G. underwent an evaluation for gifted programming at Harding Elementary in November of 2016. (Tr. 195-97). His teachers reported that he performed inconsistently, and that his understanding of the curriculum varied depending upon the day. (Tr. 195). They further reported that he was friendly but alienated his classmates by tattling on them. (*Id.*). Ultimately, the evaluation recommended that G.G. was not eligible for gifted programming, and that his needs could be met through the general education curriculum. (Tr. 196). The school documented two other disciplinary instances around this time, noting that in February of 2016, G.G. punched another student in the face, and in March of 2017,

stole an item from another student's desk and lied about taking the item. (Tr. 222).

G.G. was hospitalized in October of 2019 after police picked him up for trying to jump off a bridge. (Tr. 347). G.G. confirmed to police that he was planning to jump off the bridge to hurt himself. (*Id.*). His mother reported that his girlfriend broke up with him prior to the incident. (*Id.*). The hospital recommended inpatient assistance, which Lisenby initially declined but ultimately accepted. (Tr. 350). She requested he be admitted to Philhaven, because he was already in the day program there. (Tr. 354). Treatment notes from the hospital indicate that G.G.'s "psych work-up has been normal." (*Id.*). In January of 2021, G.G. was hospitalized again after he drank hydrogen peroxide, which he reported was a mistake he made during a project and did not intend to harm himself. (Tr. 325). In May, Lisenby brought G.G. to the hospital after the school reported that he made suicidal statements. (Tr. 314). G.G. told hospital staff that he only said things so he could get out of school. (*Id.*).

4

G.G. was enrolled in Bald Eagle Boys Camp in February of 2022. (Tr. 424). A progress evaluation dated July 9, 2022, indicated G.G. was making progress but still struggled with anger. (*Id.*). It was further noted that G.G. was easily sidetracked during tasks and needed reminders, that he disrespected others around him, and that he manipulated others to get his way or to make himself look good. (*Id.*).

G.G. underwent a mental status evaluation with Dr. Gregory Coleman, Psy.D. in September 2022. (Tr. 429-37). Dr. Coleman noted that G.G. was enrolled in a behavioral program, and that he followed with Lebanon County juvenile probation after breaking into property and setting fires with his friends. (Tr. 429, 431). It was reported that G.G. lost his temper easily, had attention and concentration issues, and had daily problems that were moderate in severity. (Tr. 430). A mental status evaluation revealed restless motor behavior, fluent speech, coherent and goal directed thought processes, mildly impaired attention and concentration, intact memory, and average intellectual functioning. (Tr. 431-32). Dr. Coleman's opinion did not set forth specific limitations in the six domains of functioning. (Tr. 434-37). However, Dr. Coleman

noted under acquiring and using information that G.G. was in the behavioral program and doing well; under attending and completing tasks that G.G. suffered from ADHD and currently was not on medications; under interacting with others that G.G. had a history of aggression; and under caring for oneself that G.G. was impulsive. (*Id.*).

In October, progress notes from Pennsylvania Counseling Services indicate that G.G. was making progress at the Bald Eagle Camp with his behaviors and mood regulation but needed work on respecting others' space. (Tr. 447). G.G.'s provider noted that he was not currently on medication for his depression or ADHD. (Tr. 448). A mental status examination revealed impaired concentration, restless movement, a euthymic mood, intact memory, fair insight and judgment, and a fidgety manner. (Tr. 448-49). Treatment notes from December revealed that G.G. reported being restrained a few times at camp because of his temper. (Tr. 451). In February of 2023, G.G. reported that he was able to stay on topic in group sessions, and that he was working on his excessive talking during morning and bedtime routines. (Tr. 455).

An April 2023 evaluation from the Bald Eagle Camp revealed that G.G. had good relationships with camp leaders. (Tr. 228). He enjoyed being with his peers, and it was noted that most conflicts among his peers were a result of petty annoyances that were not handled well. (*Id.*). The evaluation stated that G.G. liked to feel like he fit in, which led him to "be extra crazy or dramatic to gain others' attention." (*Id.*). It was further noted that G.G. was very emotional, which led to some issues with his peers, but that he "made big improvements in his attitude and skill at academics." (Tr. 229).

At a counseling visit in June, G.G.'s provider noted that he was anticipated to graduate from camp in July and he would be starting tenth grade in public school. (Tr. 463). In agreement with G.G. and his mother, his provider planned to start him on his ADHD medication when he returned from camp. (Tr. 464). A mental status examination at this visit revealed impaired concentration, logical thought processes, restless movement, a euthymic mood, fair insight and judgment, a cooperative attitude, intact decision making capabilities, and intact memory. (Tr. 464-65). In August, G.G. reported to his primary care doctor that he was

7

working for his uncle at a solar panel business doing various tasks. (Tr. 505).

It is against the backdrop of this record that an ALJ held a hearing on G.G.'s child disability application on August 23, 2023. (Tr. 28-39). Lisenby appeared and testified at this hearing on behalf of G.G. (*Id.*). Lisenby testified that she took G.G. to the hospital in May of 2021 after he made suicidal statements at school. (Tr. 31). She stated that he received inpatient treatment at Philhaven, and that he was placed in the behavioral camp for a year and a half. (Tr. 32). Lisenby described G.G.'s concentration issues, reporting that he could not focus on things such as putting away the dishes. (Tr. 33). She further testified that the behavioral camp reported issues with G.G.'s temper at least once per week. (Tr. 34). Lisenby stated that at the time of the hearing, G.G.'s arm was in a cast from punching a wall. (Tr. 35). She testified that aside from his behavioral issues, he did very well with camp. (Tr. 37).

Following this hearing, on November 6, 2023, the ALJ issued a decision denying the application for benefits. (Tr. 10-16). The ALJ first found that G.G. had not engaged in substantial gainful activity since the

date of the application. (Tr. 11). Next, the ALJ found that G.G. suffered from the following severe impairments: ADHD, ODD, bipolar disorder, depression, anxiety, and sleep disorder. (*Id.*). The ALJ determined that none of these impairments met or medically equaled the severity of a listed impairment. (Tr. 11-12).

In considering whether G.G.'s impairments functionally equaled a listed impairment, the ALJ made the following findings: regarding acquiring and using information, the ALJ noted that the state agency consultants found no limitation in this area, and that Dr. Coleman's examination revealed intact and age appropriate recent and remote memory skills. (Tr. 14). In attending and completing tasks, the ALJ found a less than marked limitation, noting the records that showed some findings of impaired concentration and attention. (*Id.*). The ALJ found a marked limitation in interacting with others. (*Id.*). He noted the records that showed problems with G.G.'s temper, his fair relationships with authority figures, and interactions with his siblings. (Tr. 15). The ALJ further recounted more recent treatment records, which showed G.G. was making progress with his mood regulation and behaviors, that

he got along well with his peers and leaders at camp, and that he did well with camp routines. (*Id.*). The ALJ found that G.G. had less than a marked limitation in his ability to care for himself, noting his history of suicidal ideations and his "rollercoaster emotions," but noting that recent treatment notes showed progress with his mood regulation and behaviors. (*Id.*). Finally, the ALJ assessed no limitations in manipulating objects and moving about or health and physical well-being.

In making these findings, the ALJ found the opinions of the state agency consultants, Dr. Gavazzi and Dr. Cowan, persuasive. (Tr. 15). The ALJ noted that these opinions contained references to Lisenby's function report as well as G.G.'s records. (*Id.*). Specifically, with respect to the marked limitations in interacting with others, the ALJ noted these opinions specifically cited to Lisenby's subjective complaints regarding G.G.'s behavior. (Tr. 15-16). The ALJ did not assign persuasive value to Dr. Coleman's opinion, concluding that Dr. Coleman did not offer any formal opinions regarding these domains of functioning. (Tr. 16). However, the ALJ specifically considered findings from Dr. Coleman's

examination in determining whether G.G.'s impairments functionally equaled a listed impairment. (Tr. 14-16). Accordingly, because the ALJ did not assess two "marked" or one "extreme" limitation in any domain, the ALJ concluded that G.G. did not meet the criteria for child disability benefits and denied his application. (*Id.*).

This appeal followed. On appeal, Lisenby argues that the ALJ should have found that G.G. had marked limitations in acquiring and using information, as well as attending and completing tasks, and should have found an extreme limitation in interacting with others. (Doc. 12 at 16-17). She further contends that the ALJ erred in finding the opinions of the state agency consultants more persuasive than Dr. Coleman's consultative examining opinion. (*Id.* at 19). This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.  Discussion

### A. Child Disability Applications – Standard of Review

The Social Security Act considers a child disabled if the child has a severe physical or mental impairment such that "he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." 42 U.S.C. § 1382c(a)(3)(B). A claimant must show that he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(C)(i). Such an impairment must meet, medically equal, or functionally equal a listed impairment. 20 C.F.R. § 416.924(d); 20 C.F.R. Part 404, Sbpt. P, App'x 1.

An ALJ follows a three-step process to determine if a child is disabled under the Act. 20 C.F.R. § 416.924(a). The ALJ must sequentially determine (1) whether the child is engaged in substantial gainful activity; (2) whether the child has an impairment or combination of impairments that is severe; and (3) whether the severe impairment(s) meets, medically equals, or functionally equals a listed impairment. *Id.* To determine if an impairment functionally equals a listing, the ALJ considers six domains of functioning: (i) acquiring and using information;

(ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). To be considered functionally equivalent to a listed impairment, an impairment must result in at least two "marked" limitations or one "extreme" limitation in these areas of functioning. *Id.* § 416.926a(a).

## B. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of

evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning

behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

## C. The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential. Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154. Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

First, Lisenby contends that ALJ improperly assessed G.G.'s limitations from his impairments, and that the ALJ should have found marked limitations in acquiring and using information and attending and completing tasks, as well as an extreme limitation in interacting with others. The plaintiff points to treatment records that show impaired

concentration during the relevant time, as well as Lisenby's testimony that G.G. had ongoing behavioral issues, as well as trouble focusing and completing tasks. However, the ALJ considered this evidence in making a finding that G.G. had moderate limitations in concentration, persistence, and pace and less than a marked limitation in attending and completing tasks. (Tr. 12, 14). The ALJ noted that the state agency consultants, who also considered Lisenby's testimony and Dr. Coleman's assessment, found less than a marked limitation in this area and no limitation in acquiring and using information. (Tr. 15). It is also worth noting that no medical opinion found more restrictive limitations in these functional domains. Dr. Coleman's statement, which the ALJ correctly noted did not offer any formal opinions as to limitations in these areas, contained notations that G.G. was doing well at the boys' camp and that he was not on his medication for ADHD but therapy was helping. (Tr. 434-35).

We reach a similar conclusion with respect to the plaintiff's argument that G.G. has an extreme limitation in interacting with others. The plaintiff points to her testimony concerning G.G.'s behavioral issues,

as well as the treatment records during the relevant time. The ALJ considered this evidence, ultimately concluding that G.G. had a marked limitation in this area. The ALJ noted Lisenby's testimony concerning G.G.'s anger issues, the consultative examiner's notes regarding G.G.'s temper, and the progress notes from the boys' camp showing that G.G. had behavioral issues. However, the ALJ further noted that more recent treatment notes showed that G.G. was making progress with his behaviors and mood regulation, and updates from the boys' camp indicated that he mostly did well with his peers at camp aside from not handling petty annoyances well. (Tr. 14-15). Moreover, Dr. Coleman's assessment noted G.G.'s history of aggression but that therapy and his program were helpful. (Tr. 435). Accordingly, the ALJ found only a marked limitation in this functional domain.

While the plaintiff would have us reweigh the evidence and conclude that the plaintiff's testimony and certain treatment records evince more restrictive limitations in these functional areas, we are simply not permitted to do so at this stage. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to re-

weigh the evidence or impose their own factual determinations.").
Additionally, "[t]he presence of evidence in the record that supports a
contrary conclusion does not undermine the [ALJ's] decision so long as
the record provides substantial support for that decision." *Malloy v.
Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).  Here, the ALJ
considered all of the relevant evidence in the record and concluded that
G.G. did not meet the criteria for child disability benefits, affording an
adequate explanation for his findings.  Accordingly, we conclude that this
decision is supported by substantial evidence.

Lisenby also asserts that the ALJ erred in finding the state agency
consultants' opinions more persuasive than Dr. Coleman's examining
opinion.  She contends that these opinions were rendered without
consideration of the majority of the medical evidence, and that the ALJ
should have afforded more weight to Dr. Coleman's findings because he
examined G.G.  At the outset, we note that plaintiff mischaracterizes the
ALJ's consideration of this evidence, arguing that the ALJ only noted the
state agency consultants' opinions.  (Doc. 12 at 19).  While the ALJ did
not afford a specific level of persuasiveness to Dr. Coleman's opinion,

since Dr. Coleman did not give any formal opinions as to these restrictions, he explicitly considered Dr. Coleman's findings in assessing whether G.G.'s impairments functionally equaled a listed impairment. (*See* Tr. 14-16). Moreover, the plaintiff's contention that Dr. Coleman's findings should have given more weight as an examining consultant is unavailing, as state agency consultants are routinely found to have more persuasive opinions than examining sources. *See e.g.*, *Mercado v. Kijakazi*, 629 F. Supp. 3d 260, 284 (M.D. Pa. 2022); *Chandler*, 667 F.3d at 361-62.[2]

While the plaintiff further contends that the state agency opinions were rendered without the majority of the medical evidence, we note that these two opinions were rendered after Dr. Coleman's September 2022 assessment, in September of 2022 and February of 2023, respectively. These opinions specifically considered Dr. Coleman's findings, as well as the other evidence in the record, including Lisenby's testimony

---

[2] We further note that this application was filed in June of 2021, after a shift in the regulations governing the ALJ's consideration of medical opinion evidence, which no longer required the ALJ to consider medical opinions within a certain hierarchy. *See* 20 C.F.R. § 404.1520c(c).

concerning G.G.'s impairments.  Ultimately, the ALJ considered the record as a whole and concluded that the limitations set forth in Dr. Gavazzi's and Dr. Cowan's opinions were supported by the objective record evidence.  That is all that is required of the ALJ under the controlling regulations. Accordingly, we conclude that the ALJ's assessment of the medical opinion is supported by substantial evidence.

Although the record in this case contained abnormal findings during the relevant period, such as treatment notes documenting G.G.'s behavioral issues and impaired concentration, we are not permitted at this stage to reweigh the evidence, *Chandler*, 667 F.3d at 359, and instead must simply determine whether the ALJ's decision was supported by "substantial evidence." *Biestek*, 139 S. Ct. at 1154.  Given that the ALJ considered all the evidence and adequately explained his decision for including or discounting certain limitations as established by the evidence, we find no error with the decision.  Therefore, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence

supported the ALJ's evaluation of this case, and this decision should be affirmed.

## IV.    Conclusion

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 7th day of May 2025.

*s/ Daryl F. Bloom*
Daryl F. Bloom
Chief United States Magistrate Judge